**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| WTI, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 2:10-CV-238-RWS |
| JARCHEM INDUSTRIES, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## ORDER

This case comes before the Court on: Plaintiff's Motion for Leave to File First Amended Complaint [58], Plaintiff's Motion for Summary Judgment [59], Defendant's Motion for Summary Judgment [61], Plaintiff's Motion to Strike Errata Sheet [82], Plaintiff's Motion to Strike and Exclude Expert Testimony [85], and Plaintiff's Motion to Strike [89]. After a review of the record, the Court enters the following order.

## I. Factual Summary

Plaintiff WTI, Inc. ("WTI") develops, manufactures, and sells functional ingredients for the poultry industry, including its Ional product line. Dkt. No.

[69-1] at ¶ 1.[1] Defendant Jarchem Industries, Inc. ("Jarchem") manufactures and sells chemicals, and the only type of sodium diacetate which Jarchem manufactures is supposed to comply with the Food Chemical Codex ("FCC"). Id. at ¶¶ 2, 13.

On November 5, 2008, Jarchem issued to WTI a continuing product guaranty for sodium diacetate which stated that "as of the date of each shipment of Sodium Diacetate FCC by Jarchem Industries, Inc. to WTI, Inc., such article is not, when shipped, adulterated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act ("FDCA")." Id. at ¶ 14. On February 9, 2009, WTI ordered sodium diacetate from Jarchem by submitting purchase orders 2889, 2890, and 2891 via e-mail. Id. at ¶¶ 3-4. The body of the e-mail stated that WTI's terms and conditions could be viewed via a hyperlink and that the purchase orders were attached to the e-mail. Ex. 19, Dkt. No. [73]. Additionally, WTI attached a product specifications form which required the sodium diacetate comply with criteria, including: "general characteristics, identification, purity (including pH and heavy metals), and granulation." Dkt. No. [61-1] at ¶ 6. It also stated "Description: White, hygroscopic crystalline

---

[1]Defendant disputes that it knew Plaintiff's business at the time of the sodium diacetate sale. Id.

2

solid with an acetic odor." Dkt. No. [68-1] at ¶ 6. In response, Jarchem faxed three sales order acknowledgments ("SOAs"). Dkt. No. [61-1] at ¶ 11.

Pursuant to purchase order 2891, Jarchem supplied WTI with 810, 50 lb. bags of sodium diacetate on June 25, 2009 and issued a certificate of analysis which stated that the product was "Sodium Diacetate FCC." Dkt. No. [69-1] at ¶ 12. Upon its arrival, WTI employee Jennifer Rench obtained a product sample for testing, and tested the product for pH level, granulation, and moisture content. Dkt. No. [61-1] at ¶ 16. As well, because the product had a "grayish tint," Rench and WTI production manager Ertan Hyusienov made a small batch of Ional by mixing a 20% concentration of sodium diacetate with sodium citrate, citric acid, and soybean oil, and the two examined the product. Id. at ¶¶ 19, 21, 24-25. Finding that the grayish tint did not affect the Ional, WTI accepted the product. Id. at ¶¶ 22-23.

Once in its possession, WTI used the sodium diacetate in its Ional product, which functions as an antimicrobial, flavoring, and coloring agent for meat products. Dkt. No. [69-1] at ¶ 17. WTI then shipped its Ional to its customers, including Tyson Foods, Inc. ("Tyson") and Newly Weds Foods, Inc.. Dkt. No. [61-1] at ¶ 26.

AO 72A
(Rev.8/82)

On July 20, 2009, WTI learned from Tyson that WTI's Ional–when put in a 25% solution–produced an "uncharacteristic substance" in Tyson's chicken applications. Dkt. No. [69-1] at ¶¶ 19-20; Dkt. No. [61-1] at ¶¶ 28, 31. In response, WTI conducted a white bucket test by making a 25% solution of sodium diacetate in reverse osmosis water. Dkt. No. [69-1] at ¶ 22. This test revealed the presence of a grayish or black substance[2] in the sodium diacetate. Id. at ¶ 23. WTI initially hypothesized that the contaminant was activated carbon, but because it did not have the equipment to test that proposition, Dkt. No. [61-1] at ¶ 32, WTI then began sending the product to third-party laboratories for testing. Dkt. No. [69-1] at ¶ 28.

On July 23, 2009, WTI sent a letter to Jarchem which stated WTI was rejecting its acceptance of the sodium diacetate and made available for return all of the unused product. Id. at ¶¶ 26-27. The same day it received a letter from ABC Laboratories that stated iron had contaminated the product. Ex. 10, Rench Dep., Dkt. No. [80]. However, four days later, WTI CEO Wolfgang Ludwig sent a letter to Tyson which offered alternative causes for the turbidity and

_____

[2]The parties dispute whether sodium diacetate should be colorless in solution. Id. at ¶ 24.

4

stated that Tyson's experience was normal based on the Ional's high-

concentration. Ex. A, Dkt. No. [83]. Specifically, the letter said the following:

> This letter is in response to your request for clarification of the
> factors responsible for turbidity noted when blending IONAL LC
> in Tyson Foods' processing facilities. When used at normal levels
> (<10% of the brine solution), the ingredients are completely
> solubilized and turbidity does not result. However, when used at
> high concentrations, lowered solubility in conjunction with a few
> other factors may enhance the normal development of a turbid
> appearance.

Id.

On August 24, 2009, the University of Georgia College of Agriculture

and Environmental Sciences found that the product was contaminated with trace

amounts of silver. Ex. 11, Rench Dep., Dkt. No. [80]. On November 16, 2009,

Chemir Analytical Services–a laboratory charged with identifying the

contaminating source–found that the contaminant was a paraffinic wax, which

included iron, aluminum, and silicon-based components. Ex. 12, Rench Dep.,

Dkt. No. [80]; Dkt. No. [69-1] at ¶ 29.

As a result of this issue, Tyson returned the Ional to WTI, destroyed its

chicken affected by the Ional, and WTI issued Tyson a credit. Dkt. No. [69-1] at

¶¶ 38-39. Additionally, WTI destroyed its unsold Ional product made with

Jarchem's sodium diacetate. Id. at ¶ 40.

AO 72A
(Rev.8/82)

WTI then filed suit in the Superior Court of Jackson County, and the action was removed to this Court. Dkt. No. [1]. WTI brought the following claims against Jarchem: 1) breach of expressed warranties; 2) breach of implied warranty of merchantability; 3) breach of implied warranty of fitness for a particular purpose; 4) negligence per se; 5) negligence; 6) breach of contract; and, 7) attorney's fees. In response, Jarchem counterclaimed for breach of contract. The parties have now moved for summary judgment, the Plaintiff has moved to strike some of Defendant's summary judgment exhibits, and the Plaintiff has moved to amend its complaint. The Court will consider each motion in turn.

## II. Discussion

### A. Motion to Strike Errata Sheet

Plaintiff first moves to strike Bharati Shah's deposition errata sheet, arguing that two of her twelve deposition changes are substantive.[3] Shah initially testified to the following:

---

[3]The Plaintiff states it is challenging the errata sheet's entirety, but Plaintiff only argues that two of the twelve changes were improper. Because Plaintiff has not stated why the remaining changes–which were predominantly spelling–should be stricken, the Court **DENIES** the motion as to the unchallenged ten corrections.

Q: Did you ever run a test to determine - strike that. Were you ever involved in a test where a solution was made of the retained sample to test for these potential black specks?

A: You are talking about the retained sample?

Q: Yes, ma'am.

A: No.

Dkt. No. [82] at 88:12-21. On her errata sheet, Shah changed her "No" response to "Yes." Additionally, Shah testified:

Q: Have you ever reviewed - do you review material safety data sheets as part of your employment.

A: No.

Dkt. No. [82] at 108:23-109:2. Shah again changed her "No" response to "Yes" on the errata sheet.

Shah has filed an affidavit which explains that she changed her answers for clarification purposes. As to the first passage, Shah states "[t]he reason I changed the answer from 'No' to 'Yes' is that I did not fully understand the question. As part of my normal duties, I conduct tests for particulates on acetate products in general; however, I did not run any special tests on the material in question by WTI." Dkt. No. [90-2] at ¶ 8. Additionally, Shah states that she changed her second answer "to clarify [her] response based upon what is meant

by 'review.' I review the material safety data sheets (meaning, look at them for the information that they contain that may be useful. I do not review them (meaning, analyzing them) to determine if the information they contain is correct." Id. at ¶ 10.

> Federal Rule of Civil Procedure 30(e)(1) states that
>
> On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
> (A) to review the transcript and recording; and
> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

The Eleventh Circuit has not squarely addressed whether deponents can make substantive changes to depositions, and the circuits have been split on the issue. See Dering v. Service Experts Alliance LLC, 2007 WL 4299968, at *5 (N.D. Ga. 2007) ("this issue is not settled in the Eleventh Circuit."); compare Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir 1997) (allowing substantive changes via errata sheets) with Burns v. Board of Comm'rs of Jackson Cnty., 330 F.3d 1275, 1282 (10th Cir. 2003) (not allowing substantive changes to errata sheets). However, the Court does not need to decide this question because Shah's errata sheet changes were not substantive. Essentially,

AO 72A
(Rev.8/82)

Shah sought to clarify her positions, and the Court does not find that WTI is prejudiced in any way by these changes. Thus, because Shah's changes were for clarification and not substantive, Plaintiff's Motion [82] is **DENIED**.

### B. Motion to Strike and Exclude Expert Kenneth McMillin

Plaintiff next moves to strike defense expert Kenneth W. McMillin's summary judgment affidavit and to exclude McMillin's opinions from trial as a sanction under Rule 37. Defendant first noticed this expert witness at 8:19 p.m. the day that discovery closed, September 12, 2011. That disclosure listed McMillin's name and stated, "[a] written report has not been prepared at this time; if one is prepared, Defendant will timely supplement this notice and provide a copy of same to Plaintiff." Dkt. No. [55] at 4. Defendant states that it waited so late to disclose this expert, even though McMillin had been assisting the Defendant in months previous, because it was concerned that Plaintiff would amend its complaint and Defendant would need McMillin's expertise. Dkt. No. [92] at 6. Additionally, in opposition to Plaintiff's summary judgment motion, Defendant attached McMillin's un-signed affidavit which was not notarized.

As an initial matter, the Court **GRANTS** Plaintiff's motion **in part** and will strike McMillin's summary judgment affidavit. This document is neither signed nor notarized and thus cannot be considered as proper evidence at the summary judgment stage. See Alexander-Johnson v. Lids/Hat World, No. 1:07-CV-865-TWT, 2008 WL 5115195, at * 6 (N.D. Ga. 2008) ("Plaintiff's affidavit is unsigned and not notarized. That document fails to conform to the definition of an affidavit, which is '[a] voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths, such as a notary public.'") (citations and footnote omitted).

However, while the Court notes that Defendant failed to follow this Court's local rules and the Federal Rules of Civil Procedure in designating McMillin, the Court will not exclude McMillin for trial, if Defendant properly notices the use of McMillin in the next phase of discovery.[4] However, Defendant must properly follow the federal and local rules during the next discovery phase and timely disclose McMillin, including his written report. See FED. R. CIV. P. 26(A)(2)(B); L.R. NDGa. 26. Thus, Plaintiff's Motion [85] is **GRANTED, in part** and **DENIED, in part**.

---

[4]As seen *infra*, the Court is reopening discovery in light of Plaintiff's amended complaint.

AO 72A
(Rev.8/82)

C. Motion to Strike Affidavits

Plaintiff next moves to strike four attachments to Defendant's Opposition brief: Exhibit A (a letter from WTI to Tyson), the Perdue Foods Affidavit, the Newly Weds Foods, Inc. Affidavit, and the Twin River Foods, Inc. Affidavit. Plaintiff argues four bases to strike these affidavits: 1) that all of the exhibits were not timely filed; 2) that the Newly Weds Food, Inc. Affidavit provided by John Seely is partially based on information and belief; 3) that the Twin River Foods, Inc. Affidavit is essentially not detailed enough and presumably based on hearsay from the affidavit's context; and, 4) that Exhibit A was not properly authenticated.

The Court first finds that the affidavits were filed in a timely fashion. While it is true that the affidavits were not filed on the record until November 7, 2011 (more than a month after Defendant's response brief was due), the documents were filed within a week of this Court entering the parties' motion to seal, and these documents were filed under seal. See Dkt. No. [70] (granting the parties' consent motion to seal). As well, while these documents were not filed on the docket, Plaintiff admits the documents were emailed to its counsel, so Plaintiff faced no prejudice in this filing delay. See Dkt. No. [89-1] at 2. Thus,

11

the Court does not find that the belated filing of these documents was improper.[5]

However, the Court will strike paragraphs 4 and 5 of Mr. Seely's affidavit as those statements are admittedly based on "information and belief." Rule 56 on its face requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge." FED. R. CIV. P. 56(c)(4). Thus, paragraphs 4 and 5 of the Newly Weds Foods, Inc. (John Seely)Affidavit are **STRICKEN** from the record. But, because the Twin Rivers Foods, Inc. Affidavit provided by Keith Day states it is based on personal knowledge, the Court will **DENY** Plaintiff's motion on that ground. As well, to the extent that the motion is based on hearsay, the Eleventh Circuit is clear that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Saunders v. Emory Healthcare, Inc., 360 F. App'x 110, 113 (11th Cir. 2010). The Court finds that any hearsay statements by Day could be reduced to admissible form, and thus will not strike them.

---

[5]Plaintiff also argues that because Defendant did not cite to any of these exhibits in its statement of material facts, even though it discussed them in its brief, the exhibits should be stricken. However, Plaintiff cites no law or rule which would mandate that result. Having cited no authority, the Court will not address this issue.

AO 72A
(Rev.8/82)

Finally, the Court finds that Plaintiff is not prejudiced by the Court's consideration of Exhibit A, even though it was not attached to an affidavit or otherwise authenticated. Plaintiff argues, citing <u>Saunders</u>, that because the Defendant did not attach the document to an affidavit for authentication, Exhibit A must be stricken. In <u>Saunders</u>, the Eleventh Circuit stated that "[t]o be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." <u>Id.</u> (citing 10 A CHARLES ALLEN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2722, at 382-84 (3d ed. 1998)). However, the Circuit went on to note that because striking the unauthenticated documents did not cause a "substantial prejudicial effect," the Circuit would affirm the district court's decision to strike. <u>Id.</u>

Here, the Court finds that Defendant would be substantially prejudiced if Exhibit A were stricken. Exhibit A is a letter written by the Plaintiff's CEO and given to non-party Tyson, the customer whose complaint started this litigation, and the document provides that the solution's turbidity was a normal result of

13

Tyson's ional concentration. The document was obtained from Tyson in discovery and was given to the Plaintiff following Tyson's production. As well, the substance of this letter was confirmed at various depositions by the Plaintiff's representatives,[6] and Plaintiff makes no argument that the document was forged or otherwise adulterated. Thus, Plaintiff's motion is **DENIED** as to Exhibit A. In sum, Plaintiff's Motion [89] is **GRANTED, in part** as to paragraphs 4 and 5 of the Seely/Newly Weds Foods, Inc. Affidavit and **DENIED** as to all other requests.

### D. Cross-Motions for Summary Judgment

Plaintiff moves for partial summary judgment on Counts I (express warranties), II (implied warranty of merchantability), IV (negligence per se), VI (breach of contract), and Defendant's counterclaim (breach of contract). Defendant has cross-moved on all of Plaintiff's claims, including attorney's fees. While the Court has considered each motion separately, it will combine each count's discussion from both perspectives under the same heading.

---

[6]For instance, Stephen Georg testified that "[t]he big difference between Tyson and the others is that Tyson used the product in a way higher concentration." Dkt. No. [74] at 57:16-22.

## 1. Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence

AO 72A
(Rev.8/82)

is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the

AO 72A
(Rev.8/82)

burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538-39 (5th Cir. 2004).

## B. Negligence and Negligence *Per Se*

Count IV of the Complaint alleges that Defendants are *per se* liable for violating the Georgia Food Act, O.C.G.A. § 26-2-20 *et seq.*, and Count V alleges that Defendant was negligent in supplying a contaminated product. Defendant has moved for summary judgment on both negligence-based claims, and Plaintiff has cross-moved on the negligence *per se* claim.

On its own motion, Defendant argues that Plaintiffs are barred by the economic loss rule, and that Plaintiff cannot prove causation. Plaintiff, on its own motion and in return, argues that the economic loss rules does not apply because Plaintiff was damaged beyond the sodium diacetate itself, and that it can prove a proper causation chain.

### 1. Economic Loss Rule

Defendant argues that Plaintiff cannot bring a claim for negligence–a tort–for an economic loss pursuant to the economic loss rule. Generally, Georgia law bars tort claims for damages that constitute only economic loss. "The

17

Georgia 'economic loss rule' in essence prevents recovery in tort when a defective product has resulted in the loss of the value or use of the thing sold, or the cost of repairing it." Busbee v. Chrysler Corp., 524 S.E.2d 539, 541 (Ga. Ct. App. 1999) (internal quotations omitted); Long v. Jim Letts Oldsmobile, Inc., 217 S.E.2d 602, 604 (Ga. Ct. App. 1976). Thus, where there is no personal injury or damage to property other than the subject property, and the only loss is pecuniary, the economic loss rule bars a claim in negligence. Squish La Fish, Inc. v. Thomco Specialty Prods., Inc., 149 F.3d 1288, 1291 (11th Cir. 1998); Vulcan Materials Co. v. Driltech, 306 S.E.2d 253, 254 (Ga. 1983); Bates & Assocs., Inc. v. Romei, 426 S.E.2d 919, 922 (Ga. Ct. App. 1993).

The Court finds that the economic loss rule does not apply in this case. Taking the facts most favorable to the Plaintiff, Plaintiff has produced evidence that its own IONAL product and Tyson's chicken, *inter alia*, were damaged by Defendant's sodium diacetate. Thus, Plaintiff has produced evidence that property beyond the sodium diacetate was damaged, and accordingly, Defendant's motion is **DENIED** as to the economic loss rule.

### 2. Causation and Breach

In its own motion, Defendant does not challenge that Plaintiff can prove

duty or injury for both of its negligence-based claims. See Morton v. Horace

Mann Ins. Co., 639 S.E.2d 352, 355 (Ga. Ct. App. 2006) ("In Georgia, the

essential elements of a cause of action for negligence are: (1) a legal duty; (2) a

breach of this duty; (3) an injury; and (4) a causal connection between the breach

and the injury."). Rather, Defendant argues that Plaintiff cannot establish

causation and that its product was not adulterated.

> To establish proximate cause, a plaintiff must show a legally
> attributable causal connection between the defendant's conduct and
> the alleged injury. The plaintiff must introduce evidence which
> affords a reasonable basis for the conclusion that it is more likely
> than not that the conduct of the defendant was a cause in fact of the
> result. A mere possibility of such causation is not enough; and
> when the matter remains one of pure speculation or conjecture, or
> the probabilities are at best evenly balanced, it becomes the duty of
> the court to grant summary judgment for the defendant.

Ladner v. Northside Hosp., Inc., 723 S.E.2d 450, 454 (Ga. Ct. App. 2012). Here

taking the facts most favorable to either party, the Court finds that there is a

genuine issue of material fact which precludes summary judgment for Plaintiff

and Defendant.

Taking the facts most favorable to Plaintiff, Plaintiff has established the

following causal chain which resulted from Defendant's breach: Tyson reported

an "uncharacteristic substance" which emanated from WTI's IONAL product

19

and contaminated Tyson's chicken, Dkt. No. [59-3] at ¶ 7; WTI conducted the white bucket test of Jarchem's sodium diacetate which revealed that when the product was placed in solution, "the water became turbid with a gray-black substance," id. at ¶¶ 9-11;[7] unlike what was observed, sodium diacetate should be colorless in solution, id. at ¶ 12; WTI then sent the sodium diacetate to a third-party laboratory who confirmed that the product was contaminated with paraffinic wax, "which included iron, aluminum, and silicone-based components," id. at ¶ 15;[8] and "[s]odium diacetate containing paraffinic wax, including iron, aluminum, and silicon-based components, does not conform to industry standards for food-grade sodium diacetate," id. at ¶ 18, or more specifically the FCC, Dkt. No. [84-3] at ¶ 8.

---

[7]Rench, WTI's Quality Assurance Manager, also affirms that "[t]he gray black appearance of Jarchem's suspect sodium diacetate in solution was almost identical to the appearance of the substance contained in pictures Tyson sent to WTI as part of its complaint." Dkt. No. [68-5] at ¶ 6.

[8]Defendant argues that because Plaintiff sent the sodium diacetate to three different laboratories which produced three different results, Plaintiff cannot prove causation. However, taking the facts most favorable to the Plaintiff, Plaintiff has produced evidence that it did not give the labs the same assignment and that two of the three labs were unable to complete the needed identification. See Rench Dep., Dkt. No. [79] at 37:1-4. Thus, Chemir lab's identification–that the sodium diacetate contained paraffinic wax–was the only complete identification from the Plaintiff's perspective and will therefore prevent summary judgment.

20

However, taking the facts most favorable to the Defendant, the turbidity did not occur from an adulteration but rather normally resulted from Tyson's high-concentration solution. See Ex. A, Dkt. No. [83] ("When used at normal levels (<10% of the brine solution), the ingredients are completely solubilized and turbidity does not result. However, when used at high concentrations, lowered solubility in conjunction with a few other factors may enhance the normal development of a turbid appearance."). As well, two other WTI clients used the Jarchem product without complaint. See Aff. Newly Weds Foods, Aff. Twin Rivers, Inc., Dkt. No. [83]. Thus, there is a genuine issue of fact regarding whether the product was adulterated and whether that adulteration caused Plaintiff's damages.

### C. Breach of Contract and Related Warranty Claims

Both parties move for summary judgment on Plaintiff's breach of contract, express warranty, and implied warranty of merchantability claims. Defendant has additionally moved for summary judgment on Plaintiff's implied warranty of fitness for a particular purpose claim, and Plaintiff has moved on Defendant's breach of contract counterclaim. Because the parties dispute what law applies to the warranty claims and whether Jarchem has disclaimed any

AO 72A
(Rev.8/82)

warranties, the Court will first decide the choice of law and related disclaimer question.

<u>1. Choice of Law, Warranty Disclaimer, and Waiver</u>

The parties differ on whether Georgia or New York law applies to the contract, and by extension, the warranties. On February 9, 2009, Stephen Georg–WTI's Director of Customer Service/Materials Coordinator–sent Jarchem's Richard Germain an email which attached WTI's three purchase orders for three different shipments of sodium diacetate. In the body of this e-mail and in its own paragraph above Georg's signature, Georg stated, "Our purchase order terms and conditions can be viewed at: http://www.wtiinc.com/documents/WTIPO.pdf." That web address was also hyperlinked. Ex. 19, Dkt. No. [73]. Upon clicking on the hyperlink, the WTI's "Terms and Conditions" document was displayed. This document stated, in relevant part, the following provisions:

> <u>1/ General Provision-Acceptance</u>: By accepting this purchase order . . . and/or shipping the goods, Seller agrees to comply fully with the terms and conditions of this purchase order. **Acceptance of this purchase order is expressly limited to the terms and Acceptance of the goods or services delivered under this purchase order shall not constitute agreement to seller's terms or conditions**. Any attachments referenced on the purchase order shall be deemed for all purposes to be an integral part of this order, any

22

contradiction between such referenced attachments and the terms stated herein, will be considered controlled by the attachment.

. . .

3/Applicable Law: The validity, interpretation, and performance of these terms and conditions and any purchase made hereunder shall be governed by the laws of New York, in force at the date of this purchase order for contracts made and to be performed.

. . .

8/Warranty: Seller expressly warrants that all goods and services furnished under this purchase order shall conform to all specifications, drawings, and appropriate industry standards, will be new, be of good material and workmanship, and free from defect s [sic] in material, manufacture or design. Seller warrants that all goods will conform to any statements made on the container or labels or advertisements, and that any good will be adequately contained, packaged, marked and labeled. Seller warrants that all goods or services furnished under this purchase order will be merchantable, and will be safe and appropriate for the purpose for which goods or services of that kind are normally used. If seller knows or has reason to know the particular purpose for which WTI, Inc. intends to use the goods or services, Seller warrants that such goods and services will conform in all respects to samples, inspection, tests and acceptance criteria. Seller's warranty shall run to the benefit of WTI, Inc., its employees and customers.

Ex. 20, Dkt. No. [73] (emphasis added).

In response to that email, Jarchem sent three, two-page, SOA documents via facsimile. The first page of each SOA was essentially a cover sheet for the second sheet–a proposed invoice. The body of the cover sheet asked WTI to

23

review the SOA, to make any corrections as needed, and to fax back the signed

cover letter. At the very bottom of this cover page under the "Sign" and "Date"

line, the following language was printed in a font 50% smaller than the body's

text:

> The following supercedes any provision in your forms, letters and papers. JARCHEM INDUSTRIES makes no warranty, whether expressed or implied, including warranties of merchantability or fitness for a particular purpose, for the chemicals it sells. Under no circumstances shall JARCHEM INDUSTRIES be liable for incidental, consequential or other damages from alleged negligence, breach of warranty, strict liability or any other theory, arising from the use or handling of the chemicals it sells. The sole liability, if any, of JARCHEM INDUSTRIES for any claims arising out of the manufacture, use or sales of its chemicals shall be for the return of the buyer's purchase price.

Ex. 21, Dkt. No. [73].

Plaintiff argues that under New York law, Defendant's SOAs constituted

acceptance of WTI's terms and conditions. New York U.C.C. § 2-207 states

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Plaintiff argues that because the SOA did not state Jarchem's acceptance was conditional upon the warranty disclaimer, the offer limited acceptance to the terms of its offer, and the disclaimer materially altered the terms and conditions of the order, WTI's terms and conditions form the contract and Jarchem's terms were merely proposed terms.

As well, Plaintiff also argues that New York U.C.C. § 2-316, which controls warranty exclusions, is consistent with its position. That provision states that

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if

25

it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

N.Y. U.C.C. LAW § 2-316 (emphasis added). "Conspicuous" is expressly defined by the Code, and that definition reads:

> A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: Non-Negotiable Bill of lading) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". [sic] Whether a term or clause is "conspicuous" or not is for decision by the court.

N.Y. U.C.C. LAW § 1-201(10).

As to the expressed warranties, WTI argues that because Jarchem's exclusions expressly contradict WTI's offer warranty term, the exclusions must be inoperative as the two terms cannot reasonably be found to be consistent with each other. Additionally, as applied to the implied warranties, Plaintiff alleges that Jarchem's disclaimer was not conspicuous as it was in smaller text, did not have a bolded heading, and was at the bottom of the page, apart from the substantive provisions.

In its response brief to WTI's motion, Jarchem argues in a footnote that the contract should be governed under Georgia law, but cites no authority for that proposition. Dkt. No. [69] at 11. Jarchem also cites no authority in its reply

brief for why it believes Georgia law should control. See Dkt. No. [86]. Thus,

because the Court finds that WTI offered a New York choice of law provision

and Jarchem did not state that its acceptance was contingent upon an alternative

Georgia law term–much less state a Georgia law term–the Court finds that New

York law governs the parties' contract.[9] Further, applying New York law,

---

[9]Even if Georgia law did apply, the Court finds that the result is the same. Georgia has adopted a similar version of New York U.C.C. § 2-316 at O.C.G.A. § 11-2-316, and that provision's expressed warranty subsection is identical. Thus, the Court's reasoning under § 2-316(1) as to expressed warranties, supra, applies with the same force here.

Additionally, Georgia's implied-warranty exclusion provision also requires the warranty to be "conspicuous," but Georgia law defines "conspicuous" differently than New York law. In Georgia, "conspicuous" is defined as:

> so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is conspicuous or not is a decision for the court. Conspicuous terms include the following:
>
> (A) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention to the language.

O.C.G.A. § 11-1-201(10). Here, Jarchem's exclusion was in 50% smaller type than the body of the SOA, was not set-off by symbols, and was not in contrasting type. Thus, the Court finds that even under Georgia law, Defendant did not disclaim the expressed or implied warranties.

Jarchem has not disclaimed the warranties as its disclaimer was not conspicuous and was not consistent with WTI's terms.

Jarchem additionally argues that even if Jarchem did not disclaim the warranties, WTI waived them through its acceptance of the product. Defendant cites <u>Jefferson Heights Quarry v. Fort Pike Assocs.</u>, 191 A.D.2d 972 (N.Y. App. Div. 1993) in support of its position. In <u>Jefferson Heights</u>, the plaintiff and defendant entered into a contract to purchase "large base and cap stone" to be used in construction of a breakwater. <u>Id.</u> at 972. The plaintiff shipped the stone, and the defendant accepted it and proceeded to build the breakwater. After the breakwater was built, the defendant rejected the stone, stating that it did not meet the contract's size specifications. The New York Supreme Court ruled that the defendant improperly rejected the goods and had waived the warranty because the defendant "accepted the stone and took control of it by using it to build the breakwater." <u>Id.</u> Thus, Jarchem argues, because WTI accepted the sodium diacetate and put it in its Ional, WTI has waived any warranties.

However, <u>Jefferson Heights</u> is easily distinguishable. There, the defendant knew when the product arrived that it did not meet the contract's size specification as the defect was readily visible, yet the defendant chose to use the

28

stone anyway. Here, in contrast, the alleged sodium diacetate defect was not readily visible and was only exposed once the IONAL was used at a 25% concentration in solution. Thus, there was no way for WTI to know at delivery that the sodium diacetate was contaminated with paraffinic wax. In fact, identification required sending the product to a laboratory. Thus, the Court does not find that WTI waived its warranties by not sending the product to the laboratory at delivery.

## 2. Express Warranties

New York U.C.C. § 2-313(1)(a) provides that express warranties are created in the following ways:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Here, the Jarchem agreed that its product "shall conform to all specifications, drawings, and appropriate industry standards, will be new, be of good material

AO 72A
(Rev.8/82)

and workmanship, and free from defect s [sic] in material, manufacture or design." Additionally, Defendant warranted that "all goods will conform to any statements made on the container or labels or advertisements" and that "all goods or services furnished under this purchase order will be merchantable, and will be safe and appropriate for the purpose for which goods or services of that kind are normally used." However, as seen supra, a genuine issue of material fact precludes summary judgment for either party on the express warranties. It is disputed whether the product was adulterated and whether that adulteration caused Plaintiff's damages. Thus, summary judgment is **DENIED** as to both parties on this claim.[10]

### 3. Implied Warranty of Fitness for a Particular Purpose

Defendant also moves for summary judgment on Plaintiff's implied warranty of fitness for a particular purpose claim. However, a genuine issue of material fact also prevents summary judgment on this claim because while Plaintiff states it told the Defendant of its food-grade purpose for the sodium diacetate, see Dkt. No. [59-4] at ¶ 7, Defendant denies that it was ever told about

---

[10]For the same reasons, both parties' motions are also denied on Plaintiff's derivative implied warranty of merchantability and breach of contract claims and Defendant's breach of contract counterclaim.

AO 72A
(Rev.8/82)

a specific purpose. See Dkt. No. [69-1] at ¶¶ 1, 9. Thus, Defendant's Motion is **DENIED** on the implied warranty of fitness for a particular purpose claim.

### 4. Attorney's Fees

Defendant finally moves for summary judgment on Plaintiff's attorney's fee claim. However, in light of the Court's ruling infra, the Court will **RESERVE RULING** on the attorney's fee question until discovery and summary judgment are completed on Plaintiff's new, intentional tort and punitive damages claims.

### E. Motion to Amend

Plaintiff finally moves to amend its complaint under Rules 15 and 16, arguing that at the deposition of Jarchem's 30(b)(6) witness, Dennis Lamb, Jarchem for the first time revealed facts which would support additional breach of contract, fraud, and punitive damage claims based on Jarchem's: 1) failure to register with the Food and Drug Administration ("FDA"); 2) failure to comply with Good Manufacturing Processes ("GMPs"); and, 3) failure to comply with the FCC. Defendant objects, arguing that the amendment is untimely because it was filed after the close of discovery and is futile.

31

On December 15, 2010, the Court entered its scheduling order which stated that "[a]mendments to the pleadings submitted LATER THAN THIRTY (30) DAYS after the Joint Preliminary Report and Discovery Plan is filed, or should have been filed, will not be accepted for filing, unless otherwise permitted by law." Dkt. No. [10] at 5. Thus, the amendment period closed January 14, 2011.

Plaintiff had initially noticed to depose Lamb on July 21 and 22, 2011 in New Jersey, but a week before the scheduled deposition, Defendant alerted the Plaintiff that the deposition would not be possible those days. Initially the parties had discussed that Lamb could come to Georgia, but eventually decided that since WTI was deposing another one of Jarchem's employees–Edward Caraway–in New Jersey in late August, the parties would conserve resources and Lamb could be deposed with Caraway in New Jersey on August 25, 2011 prior to the close of discovery on September 12, 2011.

At Lamb's deposition, WTI first learned about Jarchem's failure to register with the FDA, failure to follow GMPs, and failure to comply with the FCC. That deposition transcript was then ordered and was produced to the Plaintiff on September 14, 2011. Five days later, Plaintiff emailed a draft copy

of its proposed amendments to the Defendant to see if it would consent. Three days later, Defense counsel responsed that he did not have authority to consent to the amendment, and Plaintiff filed its motion to amend the same day.

When a motion to amend is filed after a scheduling order deadline, Federal Rule of Civil Procedure 16 is the proper guide for determining whether a party's delay may be excused. S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1241(11th Cir. 2009) (citing Sosa v. Airprint Sys., 133 F.3d 1417, 1418 n.2 (11th Cir. 1998)). A scheduling order may be modified only for good cause and with the Court's consent. FED. R. CIV. P. 16(b)(4). The key to good cause is diligence. Sosa, 133 F.3d at 1419.

The Eleventh Circuit has found three factors which warrant consideration when evaluating diligence: "(1) [whether] the [party seeking amendment] failed to ascertain facts prior to filing the [pleading] and to acquire information during the discovery period; (2) [whether] the information supporting the proposed amendment was available to the [party seeking amendment]; and (3) even after acquiring information, [whether] the [party seeking amendment was] delayed in asking for amendment." Auto-Owners Ins. Co. v. Ace Elec. Serv., Inc., 648 F. Supp. 2d 1371, 1375 (M.D. Fla. 2009) (citations omitted).

AO 72A
(Rev.8/82)

Additionally, if Defendants survive the Rule 16(b)(4) challenge, they still must satisfy Federal Rule of Civil Procedure 15. Rule 15 directs the Court to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Despite an instruction that leave should be freely given when justice so requires, leave to amend is "by no means automatic." Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979).[11] The trial court has "extensive discretion" in deciding whether to grant leave to amend. Campbell v. Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999). A trial court may choose not to allow a party to amend "when the amendment would prejudice the [other party], follows undue delays or is futile." Id.

The Court first finds that Plaintiff has demonstrated good cause under Rule 16. Plaintiff to initially schedule the deposition approximately two months before the close of discovery and only rescheduled the deposition closer to the end of discovery after Lamb's unavailability. As well, the Court finds that WTI was presented with new evidence at the deposition and does not find that waiting

---

[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the court adopted as binding precedent all decisions of the former Fifth Circuit decided before October 1, 1981.

on the deposition transcript was improper. By waiting on the transcript, Plaintiff assured it had evidence to support its claim and that its complaint was plausible.

As well, Plaintiff's complaint is not futile. Defendant first argues that because Plaintiff cannot show it breached the contract and the product was adulterated, *inter alia*, Plaintiff cannot prove its claims. However, as seen <u>infra</u>, there is an issue of fact which precludes judgment for either party on those issues. Thus, the proposed complaint is not futile on that ground. Additionally, Defendant states that the complaint is futile because "[t]here is no evidence that, as a chemical manufacturer rather than a food plant, Jarchem would even be required to register with the FDA." However, Jarchem cites no authority for this proposition, and the Court will accordingly not address an unsupported argument.

Finally, Defendant argues that Plaintiff's allegations of fraud are not plead with particularity. Essentially, Defendant argues that because Plaintiff states that the Defendant violated the "FDCA" and the "FCC," without pointing to specific provisions, the Plaintiff's assertions were not specific enough. However, Plaintiff's complaint points to: 1) the specific statements in Defendant's product guarantee and certificate of analysis 2) the time, place, and person making those

statements, 3) the way Plaintiff was misled, and 4) what defendant obtained in consequence of the fraud. <u>See</u> <u>Brooks v. Blue Cross Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1371 (11th Cir. 1997) (stating that Rule 9b may be satisfied when the complaint states: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants 'obtained as a consequence of the fraud.'"). Plaintiff is only required to point Defendant's fraudulent statements and explain how the Plaintiff was misled by them. <u>See</u> <u>id.</u> Plaintiff's allegations satisfy these requirements.

Based on the foregoing, the Court **GRANTS** Plaintiff's Motion to Amend [58] and Plaintiff's proposed amended complaint is **DEEMED FILED** as of the date of this order, and Defendant's Answer shall be due within fourteen (14) days of the entry of this Order. Because Plaintiff moved to amend after the close of discovery, the Court will extend discovery for sixty (60) days after the filing of Defendant's Answer to the Amended Complaint. Should the parties elect to

36

conduct additional expert discovery during this time, the parties are reminded to follow Local Rules and to notice the expert promptly.

## III. Conclusion

Based on the foregoing, Plaintiff's Motion to Strike Errata Sheet [82] is **DENIED**. As well, Plaintiff's Motion to Strike and Exclude Expert Testimony [85] and Plaintiff's Motion to Strike [89] are **GRANTED, in part** and **DENIED, in part**. Plaintiff's Motion for Summary Judgment [59] and Defendant's Motion for Summary Judgment [61] are also both **DENIED** due to issues of fact.

Additionally, the Court **GRANTS** Plaintiff's Motion to Amend [58] and Plaintiff's proposed amended complaint is **DEEMED ADMITTED** as of the date of this order. Because Plaintiff moved to amend after the close of discovery, the Court will extend discovery for sixty (60) days after the date of this Order. Should the parties elect to conduct additional expert discovery during this time, the parties are reminded to follow Local Rules and to notice the expert promptly.

AO 72A
(Rev.8/82)

**SO ORDERED**, this __30th__ day of July, 2012.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)