IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| WTI, INC., : | |
| : | |
| Plaintiff, : | |
| : | |
| v.   : | CIVIL ACTION NO. |
| : | 2:10-CV-0238-RWS |
| JARCHEM INDUSTRIES, INC., : | |
| : | |
| Defendant. : | |

## **ORDER**

This case is before the Court on Jarchem's Motion for Partial Summary Judgment [147] and Jarchem's Motion in Limine to Exclude Evidence Related to Destroyed IONAL LC [156]. After reviewing the record, the Court enters the following Order.

## **Background**[1]

WTI is in the business of developing, manufacturing, and selling functional ingredients for the meat and poultry industry, including its IONAL products. Jarchem is in the business of manufacturing and selling chemicals,

---

[1] Unless otherwise noted, the facts are undisputed and are taken from the Parties' respective Statements of Undisputed Material Facts. ([147-3], [151-2].) A more complete statement of the facts of this case is included in this Court's Order entered on July 30, 2012 [100]. Where necessary to provide a more complete picture of the facts and timeline in this case, the Court incorporates some of the background discussion from its prior Order.

including sodium diacetate. On or about February 9, 2009, WTI placed three orders with Jarchem for three different shipments of sodium diacetate. In support of its purchase orders, WTI supplied Jarchem with its purchasing specifications sheet for sodium diacetate. Prior to purchasing from Jarchem, WTI requested and received Jarchem's product specification sheet, which identifies the product as "Sodium Diacetate FCC" and states that the product is "GRAS [("generally recognized as safe")] by the FDA when used under GMP [("good manufacturing practices")]. . . ."

WTI's policy is to test all incoming products for compliance with WTI purchasing specifications prior to accepting the goods. In 2009, WTI's specifications incorporated chemical testing requirements from the 2008-2009 Food Chemical Codex ("FCC"). In addition to chemical testing specifications, the FCC provides "general good manufacturing practices guidelines for food chemicals" ("FCC Guidelines"). (FCC, 6th ed., 2008-2009, [59-3] at 10-11 of 14.) According to the FCC Guidelines, beyond sanitation requirements, "manufacturers, processors, packers, and distributors should establish and exercise other appropriate systems of controls throughout their operations, including food safety assurance systems such as Hazard Analysis and Critical

2

Control Points (HACCP), where applicable, to ensure that FCC substances are safe and otherwise suitable for their intended use." (Id. at 11 of 14.) The FCC Guidelines go on to list several "principles" and "considerations" of good manufacturing practices ("GMPs"). (Id.)

According to Jennifer Rench, WTI's Quality Assurance Manager, "[t]he FCC states that compliance with the FCC requires more than compliance with the testing specifications. In addition, the FCC requires manufacturers to follow GMPs, good manufacturing practices, under the Food, Drug and Cosmetic Act's ("FDCA") sanitation regulations and to institute food safety assurance systems such as HACCP, hazard analysis critical control points." (Rench Affidavit, [59-3] ¶ 6.) However, the FCC Guidelines (attached to Rench's Affidavit and referenced by her in her declaration) clearly state: "These guidelines are presented for information only and are not intended to be mandatory in any sense in regards to compliance with FCC specifications." (Id. at 10 of 14 n.1.)

Prior to accepting the sodium diacetate at issue in this case, Rench conducted initial testing on a sample of the chemical to determine whether it complied with WTI's purchasing specifications (and by extension, the FCC's

3

testing requirements). A sample batch of IONAL was also created using Jarchem's product and tested to determine whether the sodium diacetate would affect the final color of the IONAL product. After these tests were performed, WTI accepted shipment from Jarchem.

With shipment of the product, WTI requested and Jarchem provided a continuing product guaranty ("Guaranty"). The Guaranty stated: "For the purpose of Section 303(c)(2) of the Federal Food, Drug and Cosmetic Act,[2] Jarchem Industries, Inc. hereby guaranties that, as of the date of each shipment of Sodium Diacetate FCC by Jarchem Industries, Inc. to WTI, Inc., such article is not, when shipped, adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act." WTI also required and received from Jarchem a Certificate of Analysis ("COA"), which listed the product name as "Sodium Diacetate FCC." The issuance of the Guaranty and the COA conforms to standard industry practice. Jarchem also provided a Nutrition Statement, an Allergen Statement, and a Kosher Certificate for the sodium diacetate.

---

[2] Section 303(c)(2) provides that no person shall be subject to penalties for introducing into interstate commerce a food product that is adulterated or misbranded if he "establishes a guaranty or undertaking signed by, and containing the name and address of, the person residing in the United States from whom he received in good faith the article, to the effect, . . . that such article is not adulterated or misbranded . . ." 21 U.S.C. § 333(c)(2).

To the best of Jarchem's knowledge, the sodium diacetate complied with FCC and WTI specifications at the time it was shipped. (Def.'s SMF, [147-3] ¶ 6; Def.'s Reply Re SMF, [155] ¶ 6.) All products in the IONAL at issue in this case, including Jarchem's sodium diacetate, met WTI specifications prior to acceptance by WTI. The final IONAL product, which incorporated Jarchem's sodium diacetate, met WTI IONAL specifications prior to distribution to WTI customers.

On July 20, 2009, Tyson Food Inc., one of WTI's customers, informed WTI that its IONAL – at a concentration of 25% – produced an "uncharacteristic substance" in Tyson's chicken applications. Tyson returned the unused IONAL product to WTI and destroyed its chicken affected by the IONAL. WTI issued a credit to Tyson and this lawsuit ensued. Some time after this incident, WTI modified its purchasing specifications for sodium diacetate to require that the product produce no physical matter when dissolved in water at a concentration of 25%.

The present suit was filed in November 2010. On July 30, 2012, WTI filed an Amended Complaint [101] to add claims for breach of contract (Count

IX), fraud (Count X), and punitive damages (Count XI). Jarchem now moves the Court for partial summary judgment on Counts X and XI.

## Discussion - Motion for Partial Summary Judgment

### I.     Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

AO 72A
(Rev.8/82)

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

7

**II.    Analysis**

In support of WTI's fraud claim, the Amended Complaint alleges: "Jarchem represented, with intent to defraud the WTI, that Jarchem and its sodium diacetate was in compliance with both the FCDA [*sic*] and the FCC." (Am. Compl., [101] ¶ 55.)  The alleged fraudulent misrepresentations by Jarchem are: (1) Jarchem's Guaranty that as of the date of shipment, the Sodium Diacetate FCC was "not, when shipped, adulterated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act;" and (2) Jarchem's labeling of the product as "Sodium Diacetate FCC" in its COA.  (Id. ¶¶ 53-54.) WTI alleges that it reasonably relied on these "false representations" and was induced to purchase and use Jarchem's product.  (Id. ¶¶ 57-59.)

In Georgia, the tort of fraud has five elements: "(1) a false representation; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting; (4) justifiable reliance by plaintiff; and (5) damage to the plaintiff." Scarbrough v. Hallam, 525 S.E.2d 377, 379 (Ga. Ct. App. 1999).  To prevail on its summary judgment motion, Jarchem need only show a lack of evidence as to one of these elements. Collins v. Regions Bank, 639 S.E.2d 626, 628 (Ga. Ct. App. 2006). Jarchem argues that WTI has failed to produce evidence demonstrating scienter

8

(intent to deceive) or reasonable reliance. (See generally, Def.'s MPSJ, [147].) The Court agrees with Jarchem that WTI has failed to produce evidence on at least one of the elements of fraud.

The Supreme Court has described scienter as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). "For purposes of summary judgment, scienter and intent to deceive are determined on the basis of the seller's knowledge of the falsity of his representations at the time made to the prospective purchaser . . . ." Smiley v. S&J Investments, Inc., 580 S.E.2d 283, 289 (Ga. Ct. App. 2003). Jarchem argues that WTI has failed to produce any evidence that Jarchem had actual knowledge that the subject sodium diacetate failed to comply with FCC or FDCA requirements, was adulterated when shipped, or was misbranded within the meaning of the FDCA. (Def.'s MPSJ, [147] at 8-11 of 15.) WTI makes no effort whatsoever to dispute this argument.[3] Rather, WTI's response brief focuses on a theory of reckless misrepresentation. (See Pl.'s Resp., [151-3] at 11-20 of 27.)

---

[3] The Court agrees with Jarchem that WTI's sole footnote stating "WTI does not concede this point" is not sufficient to carry WTI's burden on summary judgment. (Pl.'s Resp., [151-3] at 19 of 27 n.3.) Therefore, the Court deems this argument conceded by WTI.

9

The Parties agree that reckless misrepresentation may support a claim for fraud in Georgia. See Smiley, 580 S.E.2d at 289 ("A reckless representation not known to be true can constitute fraud the same as if known to be false and made to deceive; to recklessly represent facts as true to deceive, when it is not known whether or not such facts are true, is fraud as a matter of law, while knowingly false representation is fraud in fact) (citing Boroughs v. Belcher, 85 S.E.2d 422 (Ga. 1955)). WTI contends that, by virtue of its Guaranty, Jarchem represented that it was in compliance with the FDCA, and through its COA, Jarchem represented that it complied with the FCC. (Pl.'s Resp., [151-3] at 13 of 27.) However, WTI argues, those representations were made recklessly because in 2009 Jarchem did not have: GMPs in place, an HACCP program, a Food Safety Program, employee hygiene training, strict separation between equipment that produced non-food-grade and food-grade products, or a supplier approval program for raw material suppliers. (Id. at 14 of 27.)

A.    Representation regarding compliance with the FDCA

First, regarding Jarchem's alleged misrepresentations about compliance with the FDCA, the Court agrees with Jarchem that the Amended Complaint and WTI's response brief lack specificity to determine precisely *how* Jarchem

10

was allegedly noncompliant with the FDCA.  According to Jarchem, the FDCA does not include specifications for sodium diacetate, and WTI has not offered any evidence to the contrary.  So it appears that the chemical product itself could not be out of compliance with the FDCA.

Jarchem's Guaranty, quoted in the Amended Complaint, makes reference to adulteration and misbranding within the meaning of the [FDCA]. (Am. Comp., [101] ¶ 53.)  In its response brief, WTI states: "Under the FDCA, a food is deemed misbranded if its label is false or misleading in any particular. 21 U.S.C. 343(a)(1)."  (Pl.'s Resp., [151-3] at 19 of 27.)  WTI argues: "Jarchem labeled its sodium diacetate 'Sodium Diacetate FCC,' indicating it was fit for use in food, which it was not since it did not comply with the FCC.  Therefore, the label was false and misleading. . . ."  (Id.)  Notwithstanding the fact that this provision of the FDCA appears for the first time in WTI's response brief, the argument for Jarchem's noncompliance assumes, without citing any evidence, that (1) the name of the product means that the product is fit for use in food, and (2) the product did not comply with the FCC and was thus not fit for use in food.  These conclusory statements simply do not satisfy WTI's burden on summary judgment.

11

In its response brief, WTI also states, "Both the FDCA and the FCC call for manufacturers of products used in a food to follow GMPs under the FDCA sanitation regulations and to institute food safety assurance systems such as HACCP." (Pl.'s Resp., [151-3] at 14 of 27.) However, the evidence cited by WTI is the *FCC* from 2008-2009, not the FDCA. And as the Court has already noted, the referenced FCC Guidelines state very clearly that they are just that – guidelines – and "are not intended to be mandatory in any sense in regards to compliance with FCC specifications." (FCC, 6th ed., 2008-2009, [59-3] at 10 of 14 n.1.)[4]

Finally, the issue of adulteration of Jarchem's product – in violation of the FDCA or otherwise – is central to this entire case. (See Order, [100] at 21 of 38 ("[T[here is a genuine issue of fact regarding whether the product was adulterated and whether that adulteration caused Plaintiff's damages.").) The fraud inquiry focuses on what the seller knew at the time of the sale, not what the seller knows now. In its prior Order on the Parties' competing motions for summary judgment, the Court noted: "[T]he alleged sodium diacetate defect

---

[4] The FDCA provision cited by WTI for the proposition that the FDCA requires specific GMPs (hazard analysis and risk-based preventive controls) is 21 U.S.C. § 350g. However, as Jarchem notes, that provision was not in existence in 2009 and is thus irrelevant to this dispute.

was not readily visible and was only exposed once the IONAL was used at a 25% concentration of solution. . . . In fact, identification [of a contaminant] required sending the product to a laboratory." (Order, [100] at 29 of 38.)[5] Jarchem asserts, and WTI does not dispute in its response, that "it is still not known today whether an adulterant is even present, and if so, what that adulterant may be." (Def.'s MPSJ, [147] at 9 of 15.) Thus, WTI simply has not presented evidence that Jarchem recklessly misrepresented, with scienter, that it complied with adulteration and labeling requirements under the FDCA.[6]

### B.   Representation Regarding Compliance with the FCC

At the outset, the Court questions whether naming the product "Sodium

---

[5] Notably, three laboratories came up with three different possible contaminants in the product.

[6] In its response brief, WTI mentions Jarchem's product specification form for Sodium Diacetate FCC, which notes that the product is "GRAS by the FDA when used under GMP." WTI argues that this note "shows that Jarchem had knowledge of regulations under the FDCA detailing GMPs for food grade materials. (Pl.'s Resp., [151-3] at 17 of 27.) However, Jarchem's spec form is not mentioned anywhere in the Amended Complaint. Further, WTI cites no specific regulations or requirements under the FDCA (in effect in 2009) pertaining to mandatory GMPs.

Similarly, WTI's reference to Jarchem's contractual obligation to "comply with all applicable federal, state, municipal, and local laws, orders and regulations" does not help clarify its fraud claim against Jarchem. (Id. at 18 of 27.) Again, WTI simply states: "Jarchem had a contractual duty to *know* what was legally required by the FDCA and FCC." (Id. (emphasis added).)" WTI doesn't state *what* Jarchem was required to do under the FDCA, but failed to do.

13

Diacetate FCC" in the COA constitutes a representation regarding Jarchem's FCC compliance. But construing the facts in a light most favorable to WTI, as the court must, it assumes that the product's name was intended to represent Jarchem's full compliance with the FCC. It is undisputed that Jarchem's product satisfied WTI's and the FCC's chemical testing specifications before it was accepted by WTI. WTI's fraud claim is based on alleged misrepresentations by Jarchem regarding its compliance with other FCC requirements.

WTI relies on deposition testimony from Dennis Lamb and Edward Carway to show that even though Jarchem's product met the FCC's testing specifications, Jarchem still defrauded WTI because it knew it did not comply with other requirements under the FCC. As admitted by Jarchem, Mr. Lamb and Mr. Carway testified that in 2009 Jarchem lacked GMPs, an HACCP program, a Food Safety Program, employee hygiene training, strict separation between equipment that produced non-food-grade and food-grade products, and a supplier approval program for raw material suppliers. (See Pl.'s Statement of Add'l Material Facts, [151-2] ¶¶ 16-23.) The Court agrees with Jarchem,

14

however, that this deposition testimony does not show that Jarchem fraudulently misrepresented its compliance with the FCC.

The FCC "requirements" pertaining to GMPs are not requirements at all; they are guidelines. (See FCC, 6th ed., 2008-2009, [59-3] at 10-11 of 14.) According to the FCC Guidelines, "good manufacturing practices" encompass a long list of "considerations." (Id. at 11 of 14.) The FCC Guidelines state, manufacturers "should establish and exercise other appropriate systems of controls throughout their operation, including food safety assurance systems such as Hazard Analysis and Critical Control Points (HACCP), where applicable, to ensure that FCC substances are safe and otherwise suitable for their intended use." (Id.) Other than HACCPs, the FCC Guidelines do not list specific programs, steps, policies, or practices manufacturers must have in place to satisfy GMP principles.

Jarchem cites evidence of controls and procedures it did have in place in 2009 that fall within the listed "principles" and "considerations" of GMPs. (See Def.'s Resp. to Pl.'s Statement of Add'l Material Facts, [152] ¶ 6.) Thus, there is some question as to whether Jarchem made any misrepresentation at all regarding its compliance with the FCC. At the very least, the Court agrees with

15

Jarchem that there is no evidence showing scienter or an intent to deceive based on actual knowledge or reckless misrepresentation.[7]  Thus, Jarchem's Motion for Partial Summary Judgment on Counts X (fraud) and Count XI (punitive damages)[8] is **GRANTED.**

**Motion in Limine to Exclude Evidence Related to Destroyed Ional LC**

On July 20, 2009, Tyson informed WTI that its IONAL – at a concentration of 25% – produced an "uncharacteristic substance" in Tyson's chicken applications.  By July 23, 2009, WTI notified Jarchem that it was rejecting Jarchem's sodium diacetate and revoking any acceptance of Jarchem's materials.  On July 24, 2009, Tyson informed WTI that it had issued a destroy order on its contaminated chicken product, and would return the unused IONAL to WTI.  WTI arranged and paid for return of the product and sent replacement IONAL to Tyson.  By August 4, 2009, WTI and Jarchem's dispute over alleged

---

[7] Having found that WTI has has failed to carry its burden on at least one element of its fraud claim, the Court need not address Jarchem's alternative argument regarding reasonable reliance.

[8] The Parties and the Court agree that WTI's claim for punitive damages depends on survival of its fraud claim.  Because the Court has dismissed the fraud claim, punitive damages are not available in this case.

16

contamination of the sodium diacetate was submitted to Jarchem's insurance carrier and a reservation of rights letter was issued.

In January 2010, WTI destroyed all of the returned IONAL (approximately 40,000 pounds). A single bag of the subject IONAL was found in a Tyson facility in Texas, and was tested by the Parties during discovery. In its current motion, Jarchem argues that WTI's destruction of the returned IONAL amounts to spoliation and seeks sanctions or, in the alternative, an Order excluding "evidence concerning the destroyed IONAL LC and damages related thereto." (Motion in Limine, [156] at 19 of 21.)

WTI's demand for damages totals "$256,885.22, plus legal interest from the date of breach and attorney's fees in an amount to be proven at trial." (Pl.'s Second Supplement to Pl.'s Initial Disclosures, [51] at 2 of 5.) Specifically, WTI seeks:

- $147,427.00 for "credit WTI issued to its customer Tyson for product returned to WTI for destruction;"

- $41,338.55 "for freight and expedited reshipping costs to return the products;"

- $3,217.47 in overtime;

- $6,616.94 for extra labor costs;

17

- $50,467.68 for payment to Tyson "for its loss from adulterated finished goods;"

- $2,687.58 for "disposal of its contaminated finished goods;" and

- $5,130.00 for "laboratory testing of the defective sodium diacetate upon discovery of the defect." (Id.)

Jarchem argues that because there is no evidence that the destroyed IONAL was defective – and there is now no possible way of determining whether it was defective – any alleged damages related to the destroyed product are merely speculative, and therefore evidence related to such damages must be excluded. (See Generally Motion in Limine, [156].) The Court agrees with Jarchem.

"Spoliation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation." Baxley v. Hakiel Indus., Inc., 647 S.E.2d 29, 30 (Ga. 2007) (quotations and citation omitted). As an initial matter, WTI admits that litigation against Jarchem was contemplated at the time it destroyed the returned IONAL. (Pl.'s Resp., [157] at 20 of 27.) WTI maintains, however, that the destroyed IONAL was not necessary for this litigation. (Id.) On the other hand, WTI admits that "some of WTI's stated damages are related to the IONAL that WTI sold to Tyson and had to replace," and argues "WTI is entitled to collect damages it incurred related to Tyson's

18

return of the IONAL and WTI's replacement of that product because those damages were caused by Jarchem's contaminated sodium diacetate." (Id. at 21 of 27.)

The issue of causation is central to this dispute. Evidence in the record shows that WTI sold IONAL containing Jarchem's allegedly contaminated sodium diacetate to two other customers (Purdue and Newlyweds), and neither of those customers reported issues or defects. That fact suggests that even if some IONAL was contaminated because of Jarchem's sodium diacetate, the contamination may not have affected all of WTI's product. Therefore, a central question is how much, if any, of WTI's damages can be attributed to defects in Jarchem's chemical.

WTI argues that the issue in this case is Jarchem's sodium diacetate and "the IONAL product [i]s not at issue in the dispute between WTI and Jarchem." (Pl.'s Resp., [157] at 10 of 27.) However, based on its own enumeration of losses – the majority of which do relate to the returned *IONAL product* – the destroyed IONAL is crucial to WTI's claim for damages.[9] Jarchem argues, and

---

[9] WTI admits that it did not destroy the returned IONAL until it knew that Tyson would not pursue litigation against WTI for the defective product. It strikes the Court as odd that WTI would preserve the product for one potential suit, but destroy it before it brought its own action arising out of the same operative facts.

19

the Court agrees, that its opportunity to test less than .125% of the destroyed IONAL does not have any statistical relevance in demonstrating a defect in the remaining 40,000 pounds of returned IONAL.

Jarchem admits that, "[t]o the extent WTI can prove at trial that the IONAL LC <u>actually used</u> was defective (and that the defect was caused by Jarchem's sodium diacetate), WTI would be entitled to reasonable damages it paid Tyson for the discolored poultry." (Def.'s Reply, [158] at 18 of 24.) However, those damages are "entirely separate from WTI's alleged damages for the destroyed IONAL LC." (Id.) The Court agrees with Jarchem's contention. Therefore, Jarchem's Motion in Limine is **GRANTED** and all evidence concerning damages related to the returned and destroyed IONAL is excluded.

## Conclusion

Based on the foregoing, Jarchem's Motion for Partial Summary Judgment [147] is **GRANTED** and Jarchem's Motion in Limine [156] is **GRANTED.**

**SO ORDERED**, this  31st  day of March, 2014.

**RICHARD W. STORY**
United States District Judge